**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


PFIZER INC.,                          :
                                      :
        Plaintiff,                    :      CIVIL ACTION
                                      :
   v.                                 :      No. 17-cv-4180
                                      :
JOHNSON & JOHNSON and JANSSEN         :
BIOTECH, INC.,                        :
                                      :
        Defendants.                   :


**MEMORANDUM**

**Joyner, J.**                                    **August 8, 2018**

Before the Court are Defendants' Motion to Dismiss (Doc. No. 27) and Corrected Memorandum in Support thereof (Doc. No. 31), Plaintiff's Response in Opposition thereto (Doc. No. 42), Defendants' Reply in Support thereof (Doc. No. 48), and Plaintiff's Notice of Supplemental Authority (Doc. No. 54). We deny Defendants' Motion for the following reasons.

## I.   BACKGROUND

This case arises from an antitrust action brought by Pfizer, Inc. ("Pfizer") against Johnson & Johnson, along with its wholly owned subsidiary, Janssen Biotech, Inc. (collectively, "J&J"), for allegedly anticompetitive practices in the pharmaceutical market for infliximab products. The practices at issue are embodied by exclusive agreements and bundled rebates. Pfizer's principal claim is that J&J violated federal antitrust laws by engaging in

anticompetitive behavior to shield Remicade from competition posed by Pfizer's biosimilar, Inflectra.

Under consideration is J&J's Motion to Dismiss Pfizer's Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). This Motion is fully briefed and ripe for the Court's adjudication. The Court has considered the parties' submissions and decides this matter without oral argument. Fed. R. Civ. P. 78; Loc. R. Civ. P. 7.1(f).

## I. ALLEGED FACTS[1]

The subject medications in this litigation are J&J's Remicade and Pfizer's Inflectra. Both are branded forms of infliximab, which is a biologic drug used to treat a range of immune-mediated diseases. Compl. ¶35. Biologics are relatively new medications to the pharmaceutical market, and their unique qualities are relevant to our decision.

Biologic medications, such as infliximab, are complex mixtures derived from living systems. Id. ¶28. Biologics stand in contrast to more common drugs that are chemically synthesized and whose structure is known. Id. Therefore, the composition of biologics are not easily identified or characterized. Id. This makes

_____

[1] Unless otherwise noted, the following facts are taken from Pfizer's Complaint. On consideration of a Rule 12(b)(6) motion to dismiss, the allegations in the plaintiff's complaint are generally taken as true and all reasonable inferences are drawn in favor of the claimant. See Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

biologic medications difficult to replicate and produce in generic form.  Id.

The emergence of biologics prompted Congress to enact the Biologic Price Competition and Innovation Act ("BPCIA").  Id. ¶31. The BPCIA provides an abbreviated regulatory approval pathway for the introduction of drugs that are biosimilar to a biologic, similar to the abbreviated approval process for generic drugs under the Hatch-Waxman Act.  Id. ¶33.  To prove that an applicant drug is biosimilar to an originator product, the applicant must show that it is "highly similar to the [originator] notwithstanding minor differences in clinically inactive components" and that "there are no clinically meaningful differences between the [proposed biosimilar] and the [originator] in terms of safety, purity, and potency."  Id. (quoting 42 U.S.C. §262(i)(2)).

One important difference between biosimilars approved under the BPCIA and generic medications approved under the Hatch-Waxman Act is that biosimilars are not automatically substitutable with the originator biologic.  Id. ¶34.  While it appears there is a process in which a biosimilar can become automatically substitutable once achieves interchangeability status with the FDA, Pfizer claims that whether the biosimilar can be automatically substituted would ultimately depend on state law.  Id.  A key aspect to this distinction, according to Pfizer, is that "it enables biologic originator firms to leverage their monopolies over

existing patients to extract anticompetitive commitments from insurers and providers." Id.

With this in mind, we turn to the competing products in this case. J&J introduced the first infliximab product under the brand name Remicade in the United States in 1999. Id. ¶38. The FDA has approved Remicade's indications for rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, ulcerative colitis, Chron's disease, and plaque psoriasis. Id. ¶¶45, 83. Pfizer estimates that 475,000 patients in the United States receive at least one dose of Remicade annually. Id. ¶39. Because of its patients, J&J enjoyed a monopoly over the infliximab market in the United States until 2016. Id. ¶3.

Pfizer brought Inflectra to market in 2016 after it received FDA approval as the first biosimilar to Remicade. Id. ¶5. The FDA approved Inflectra for the same indications as Remicade, except for pediatric ulcerative colitis, which accounts for a minimal amount of Remicade's sales. Id. ¶45.

Remicade and Inflectra are administered intravenously at an institutional setting, such as a clinic or hospital. Id. ¶49. They are "medical benefit" products, in contrast to "pharmacy benefit" products. Id. ¶¶49-50. As medical benefit products, Remicade and Inflectra are first purchased by the providers, who later seek reimbursement after administering it on patients. Id. Because the provider bears financial risk posed by the patient or

patient's insurer not reimbursing them for the cost of medical benefit products, providers have an interest in utilizing drugs that are widely covered by insurers. Id. ¶50.

Within weeks of Inflectra's launch in 2016, J&J began to deploy its "Biosimilar Readiness Plan." Id. ¶6. Pfizer claims that the "core features of the plan are exclusionary contracts that foreclose Pfizer's access to an overwhelming share of consumers, coupled with anticompetitive bundling and coercive rebate policies designed to block both insurers from reimbursing, and hospitals and clinics from purchasing, Inflectra or other biosimilars of Remicade despite their lower pricing." Id. Pfizer alleges that J&J's anticompetitive scheme targeted both insurers and providers and involved exclusive contracts for Remicade, multi-product bundled rebates, rebates based on the bundling of existing (incontestable) and new (contestable) infliximab patients, and creating a "rebate trap" that prevented Pfizer and other competitors from competing with Remicade. Pfz. Resp. at 6 (citing Compl. ¶¶ 8, 9, 11, 55-79, 98) (Doc. No. 42).

*Exclusive Contracts*. A key component of J&J's scheme was to secure contractual commitments from commercial insurance companies to exclude biosimilars from coverage under their plans, thereby making Remicade the exclusive infliximab available to patients covered under those plans. Id. ¶58. A portion of these agreements contained express terms that would exclude biosimilars from their

medical policies and drug formularies.  Id.  The remaining portion of these agreements contained a "fail first" provision, which would require a patient to first try and fail on Remicade before the insurance company would reimburse Inflectra or another biosimilar. Id.  However, if a patient first fails on Remicade, it would "defy sound medical judgment" for a physician to switch to a therapeutic equivalent biosimilar, such as Inflectra, rather than try another therapy.  Id.  At least 70 percent of commercially insured patients in the United States fall under plans that have adopted these express or de facto agreements to exclude Inflectra and other biosimilars.  Id. ¶59.

*Bundled Rebates and Multi-Product Bundling*.  Pfizer also alleges that J&J has forced insurers into accepting exclusive contracts by introducing a rebate program that would provide savings off Remicade's increasing list price for all existing Remicade patients.  Id. ¶¶9, 66.  The threat of not qualifying for the rebate would result in significant costs for insurance companies because it would apply to both new and existing Remicade patients.  Id.

Pfizer posits that the force of J&J's "all-or-nothing" rebate program is effective because it bundles the base of existing Remicade patients with new patients entering the infliximab market. Id.  ¶¶9, 65.  Pfizer asserts that the exiting Remicade patients represent inelastic demand, or incontestable patients, who are "highly unlikely" to stitch to a biosimilar regardless of price.

Id. By premising rebates on this incontestable population, J&J is able to force insurance companies to exclude Inflectra from competing for new patients entering the infliximab market. Id. ¶¶9, 66. Pfizer refers to this as the "rebate trap." Id. ¶66.

Beyond bundling contestable and incontestable patients, J&J has also bundled rebates across multiple products. Id. ¶¶9, 67. In essence, if an insurer refuses to grant exclusivity to Remicade, the insurer would be forced to pay a higher price on other J&J products in addition to Remicade. Id. Pfizer identifies Simponi, Simponi Aria, and Stelara as other J&J products included in its multi-product bundled rebate program. Id. Pfizer also claims it could offer no competing drugs to these products. Id.

Pfizer claims that Inflectra's exclusion from coverage by most insurers results in an even greater foreclosure than just the patients covered by those insurers. Id. ¶¶10, 69, 70, 71. As an infusion product, infliximab is administered at a provider's facility. The provider therefore purchases and stocks infliximab products. According to Pfizer, the risk that Inflectra will not be reimbursed by a significant portion of patients' insurers causes physicians to only purchase, stock, and proscribe Remicade for nearly all of their infliximab patients. Id. ¶¶10, 69-71.

Pfizer claims that J&J's multi-faceted approach to control the infliximab market has foreclosed it from competing. Pfizer alleges that it continues to offer "a significantly lower price for

Inflectra unit-for-unit." Id. ¶66. Despite a lower unit cost, insurance companies continue to enter into exclusive agreements with J&J to cover Remicade for all infliximab patients to avoid losing rebates on the substantial base of existing Remicade patients who are not likely to switch to Inflectra. Id. To overcome the "rebate trap," Pfizer claims that it would have to follow J&J's lead and price Inflectra below its own average variable cost. Id. ¶¶66, 77, 78. Pfizer states that it continues to negotiate with providers to make Inflectra the lower-priced infliximab option on a per-unit basis, even in the form of offering guarantees. Id. ¶77. Again, according to Pfizer, its efforts to compete on price have failed because of J&J's efforts to foreclose it from the market. Id.

As a result of J&J's exclusionary contracting scheme, and despite Pfizer's efforts to compete, Remicade's price continues to rise. Id. ¶¶8, 12, 47, 80-82, 100, 102; Pfizer's Not. of Supp. Auth. (Doc. No. 74). Pfizer alleges that both Pfizer's Wholesale Acquisition Price ("WAP") and "Average Sales Price" ("ASP"), which is a net price accounting for rebates and other discounts, continues to rise despite insurers and providers now having a lower-cost alternative that, according to Pfizer, differs in no meaningful way. Id. ¶¶13, 42, 45-47, 104; Pfz. Not. of Supp. Auth. at 2. According to Pfizer, J&J's ability to increase the price of Remicade quarter after quarter since Pfizer brought Inflectra to market "underscores

the plausibility of [Pfizer's] allegations" that J&J's scheme has unlawfully restrained--and continues to unlawfully restrain--biosimilar competition to Remicade.  Pfz. Not. of Supp. Auth. at 2.

As a result of J&J's anticompetitive conduct, Pfizer claims that it has been foreclosed from competing for at least 70 percent of all commercially insured patients in the United States.  Compl. ¶8.  The spillover effect that J&J's scheme causes on providers' purchasing decisions has led 90 percent of provider account stocking no Inflectra at all.  Id. ¶12.  As of September 2017, J&J maintained an over 96 percent marketshare of infliximab unit sales in the United States.  Id.  ¶102.

Pfizer points out that it is not the only one harmed as a result of J&J's exclusionary conduct.  Id. ¶104.  Since the FDA approved Inflectra, J&J has increased the price of Remicade by nearly 10 percent, which in turn increases the cost to private insurance companies, government payers, and consumers.  Id. ¶¶13, 104.

## II.  LEGAL STANDARD

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Plaintiffs are not required to provide detailed factual allegations in their complaint, though they must do more than merely state legal conclusions and formulaic

recitations of the elements of the cause of action.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A party may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a district court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom."  Krantz v. Prudential Invs. Fund Mgmt. LLC, 305 F.3d 140, 142 (3d Cir. 2002) (quoting Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)).  While a court generally cannot consider matters outside the pleadings, "a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks and alteration omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citation omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than

a sheer possibility that a defendant has acted unlawfully." Id. at 678 (quoting <u>Twombly</u>, 550 U.S. at 556). A plaintiff is entitled to all reasonable inferences from the facts alleged, but a plaintiff's legal conclusions are not entitled to deference, and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986).

The Court's analysis, below, applies this governing standard to J&J's Rule 12(b)(6) arguments for dismissal.

## IV. DISCUSSION

Pfizer has asserted claims under Section 1 and Section 2 of the Sherman Act and Section 3 of the Clayton Act. Compl. ¶¶110, 117, 125, 136. The law applicable to each claim is effectively the same as it applies to J&J's Motion to Dismiss. <u>Eisai, Inc. v. Sanofi Aventis U.S., LLC</u>, 821 F.3d 394, 402 n.11 (3d Cir. 2016). Specifically, to sufficiently plead an actionable antitrust violation, Pfizer must plead facts showing that J&J engaged in anticompetitive conduct and that Pfizer suffered antitrust injury as a result. <u>Id.</u>

J&J raises three lines of attack against J&J's Complaint. First, J&J generally targets Pfizer's alleged pleadings, arguing that Pfizer has failed to plead facts that constitute an antitrust injury. Second, J&J argues that Pfizer has failed to plead specific allegations establishing antitrust injury with respect to the particular conduct that is the subject of Pfizer's Complaint.

Lastly, J&J argues that the facts that Pfizer did plead lack sufficient basis to support its antitrust injury. We address each below.

## A.    General Antitrust Injury

"Competition is at the heart of the antitrust laws." Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc., 886 F.3d 332, 338 (3d Cir. 2018) (internal quotation omitted). Antitrust laws are only aimed at curtailing anticompetitive conduct, "or a competition-reducing aspect or effect of the defendant's behavior." Id. In other words, the underlying principle of our antitrust laws is to protect competition, not competitors. Id.

The law therefore establishes antitrust injury as a common pleading requirement for antitrust plaintiffs. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 US 477, 489 (1977); see also W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 101 (3d Cir. 2010); Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 875-76 (3d Cir. 1995). An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick, 429 U.S. at 489.

Under this requirement, Pfizer "must allege harm to competition, not just harm to its own business" to adequately plead antitrust injury. In re EpePen (Epinephrine Injection, USP) Mktg., Sales Practices and Antitrust Litig., 2017 U.S. Dist. LEXIS 209710, at *64 (D. Kan. Dec. 21, 2017); see also Philadelphia Taxi Ass'n,

886 F.3d at 338. "This standard, on a motion to dismiss, requires an antitrust plaintiff to allege facts capable of supporting a finding or inference that the purported anticompetitive conduct produced increased prices, reduced output, or otherwise affected the quantity or quality of the product." In re EpePen, 2017 U.S. Dist. LEXIS 209710, at *64-65 (citing National Collegiate Athletic Ass'n v. Board of Regents, 468 U.S. 85, 113 (1984); Cohlmia v. St. John Medical Center, 693 F.3d 1269, 1281 (10th Cir. 2012); Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 641 (3d Cir. 1996)).

While an antitrust plaintiff must present plausible allegations establishing antitrust injury, "the adequacy of a [plaintiff's] contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial." Brader, 64 F.3d at 869. Accordingly, "the existence of the antitrust injury is not typically resolved through motions to dismiss." Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417-18 (3d Cir. 1997) (citing Brader, 64 F.3d at 876). The distinction between these propositions is that a plaintiff must assert allegations making plausible the claim that it, and the competitive market, suffered as a result of defendant's anticompetitive conduct; however, on a motion to dismiss, we liberally analyze the adequacy of those allegations, and of course, we do not judge the validity of those claims.

For example, in <u>Brader</u>, the Third Circuit reversed the district court's dismissal of antitrust claims based on the antitrust injury pleading requirement.  64 F.3d at 875-76.  The Third Circuit noted that the plaintiff did in fact plead that the defendant hospital "prevented him and others from engaging in the practice of general vascular trauma surgery in the relevant market, and prevented other hospitals in the relevant market from employing or granting medical staff privileges to the [p]laintiff for the purpose of competing with defendants."  <u>Id.</u> at 876.  These allegations alone were sufficient to state a claim for antitrust injury.  <u>Id.</u>

Pfizer's Complaint sufficiently alleges that it has suffered an antitrust injury as the result of J&J's anticompetitive conduct. J&J's efforts to foreclose Pfizer from the market, as Pfizer has alleged, have led to increased prices for consumers and limited competitive options for end payors, providers, and patients.  Pfizer provides detailed allegations regarding J&J's exclusionary terms with many of the nation's largest insurers, the incentive structure that forces end payors and providers into accepting those terms, Pfizer's efforts to compete, including its guarantees that Inflectra would cost less than Remicade, and showed how market participants on many levels are injured from J&J's ability to sell Remicade without having to compete with Inflectra and other biosimilars.

Along a similar line of attack, J&J also takes aim at Pfizer's alleged antitrust injury by arguing that Pfizer's inability to gain

market share is caused by reasons other than J&J's alleged anticompetitive conduct. For example, J&J argues that Inflectra's lack of competition is the result of providers' lack of comfort and awareness of biosimilars, Inflectra's lack of "interchangeability" status with Remicade, and Remicade's substantial rebates. J&J Corrected Mem. at 1, 14-15 (Doc. No. 31).

While these arguments may prove true after discovery, they are not grounds for dismissing Pfizer's Complaint. The existence of possible alternative causes of an antitrust injury is not a valid ground for dismissal. In re EpePen, 2017 U.S. Dist. LEXIS 209710, at *76 (D. Kan. Dec. 21, 2017). In other words, an antitrust plaintiff is not required to disprove all other possible alterative causes to survive a motion dismiss.

This reasoning is illustrated in In re EpePen, in which Sanofi asserted antitrust claims against Mylan on the basis that Mylan prevented Sanofi's pharmaceutical from competing. 2017 U.S. Dist. LEXIS 209710, at *19-21. On a motion to dismiss, Mylan argued that Sanofi's inability to compete was instead a result of its poor marketing decisions. Id. at *76. Mylan also argued Sanofi's lack of success was more likely attributable to Sanofi's product recall than Mylan's conduct. Id. at *77. Rejecting Mylan's arguments, the district court noted that "[t]hese arguments merely foreshadow factual disputes that the court cannot resolve on a motion to dismiss." Id. The court therefore "refuse[d] to dismiss Sanofi's

claims at the pleading stage based on Mylan's arguments that alterative reasons caused the alleged injuries." Id. at *76.

While J&J may ultimately be correct that Inflectra's lack of success is the result of something other than J&J's conduct, its argument is misplaced at this stage in the litigation. In considering the sufficiency of Pfizer's alleged antitrust injury, "dispositive weight should not be given to lists of possible alternatives, which virtually any defendant can generate." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶338 (4th Ed., 2018 Cum. Supp. 2010-2017). We therefore reject J&J's invitation to dismiss Pfizer's Complaint on the basis that Pfizer's own actions caused Inflectra's lack of success to date.

## B. Conduct Specific Antitrust Injury

J&J next asks us to dismiss Pfizer's Complaint on the basis that Pfizer has failed to allege facts establishing antitrust injury resulting from J&J's particular conduct that is the subject to Pfizer's Complaint.

As noted above, Pfizer claims that J&J has engaged in a multifaceted scheme to prevent Inflectra and other biosimilars from competing with Remicade. Pfz. Resp. at 19. This scheme includes "secur[ing] contractual commitments from commercial insurance companies to exclude biosimilars from coverage under their plans." Compl. ¶58. Such commitments, as Pfizer alleges, cause Remicade to

16

be the exclusive infliximab available to new and current infliximab patients. Id. The alleged scheme also includes bundling, in the form of multi-product bundles and a theory based on bundling Remicade's existing and new patients. Id. ¶¶65-68.

Exclusive dealing arrangements arise when a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time. These agreements can be in the form of express or *de facto* terms--terms that naturally result in the buyer purchasing exclusively from the seller. ZF Meritor, LLC v. Easton Corp., 696 F.3d 254, 270 (3d Cir. 2012). In ZF Meritor, the Third Circuit noted there was sufficient evidence of a *de facto* exclusive dealing arrangement where no risk adverse purchaser would refuse the agreement out of caution for jeopardizing its relationship with the largest seller. Id. at 283.

On one hand, such agreements may benefit consumers because they can assure supply and price stability. On the other hand, such agreements can also deprive competitors access to a certain market. We therefore consider exclusive dealing arrangements under a rule of reason framework, in which we analyze "the likely or actual anticompetitive effects of the exclusive dealing arrangement, including whether there was reduced output, increased price, or reduced quality in goods or services." Eisai, Inc. v. Sanofi Aventis U.S., LLC, 821 F.3d 394, 403 (3d. Cir. 2016).

Another form of potentially anticompetitive conduct is bundled

rebates. Bundled rebates pose antitrust concern when a defendant forecloses competition from its product in a competitive market by linking it to a product on which it faces no competition. LePage's Inc. v. 3M, 324 F.3d 141, 156 (3d Cir. 2003); SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1065 (3d Cir. 1978). In SmithKline, the Third Circuit affirmed as an antitrust violation the defendant's rebates based on the purchase of multiple products because the bundle, in effect, "insulated its product from true price competition." 575 F.2d at 1065. The same was true in LePages's, where the defendant "used its monopoly in transparent tape, backed by its considerable catalog of products, to squeeze" its competitor from the market. 324 F.3d at 157. Similar to exclusive dealing agreements, bundled rebate claims are analyzed under a rule of reason framework.

Focusing on Pfizer's alleged antitrust injury, J&J makes several arguments specific to each aspect of its alleged anticompetitive conduct.

First, J&J argues that Pfizer's alleged antitrust injury based on J&J's multi-product bundling should be dismissed because Pfizer failed to allege that it offered its own multi-product bundles. According to J&J, Pfizer was either required to plead facts establishing that it offered its own competing bundle or that it was incapable of doing so. J&J Resp. at 13.

J&J relies heavily on Eisai, where the Third Circuit stated it

previously "limited the reasoning in <u>LePage's</u> to cases in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products, which conditions the rebates on purchases across multiple different product lines." 821 F.3d at 405. In <u>Eisai</u>, the Third Circuit reviewed the circuit's prior decisions in bundling cases and noted that bundling can be anticompetitive when it "forecloses portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer." <u>Id.</u>

Pfizer, of course, is not a single-product producer. It admits as much in its Complaint. Compl. ¶18. Moreover, Pfizer has not alleged any facts suggesting that J&J is hindering its ability to compete with J&J's multi-product bundles by offering their own multi-product bundles. J&J's multi-product bundles, on their own, therefore do not present antitrust concern.

Second, J&J cites <u>Eisai</u> for the proposition that bundling contestable and incontestable demand, for the same product, cannot constitute an antitrust violation. However, the Third Circuit did not completely shut the door on such a theory, as J&J argues. <u>Id.</u> at 406. Rather, it affirmed summary judgment with the factual support that "nothing in the record indicates that an equally efficient competitor was unable to compete." <u>Id.</u>

Bundling Remicade's incontestable demand could create anticompetitive consequences by foreclosing competition for new infliximab patients--thereby posing antitrust concern that was lacking in <u>Eisai</u>.  Taking Pfizer's allegations as true, new infliximab patients are contestable because they have not yet been anchored to a specific infliximab product.  If incontestable demand is truly inelastic, then this could fall into a traditional bundling case where J&J has bundled its power over existing Remicade patients to break the competitive mechanism and deprive new infliximab patients (and their insurers) of the ability to make a meaningful choice between Remicade and its biosimilars.  <u>See Eisai</u>, 821 F.3d at 404.  We therefore refuse to dismiss Pfizer's bundling claim as it relates to contestable and incontestable demand.

### C.  Allegations Supporting Pfizer's Efforts to Compete

Lastly, J&J argues that Pfizer's alleged antitrust injury based on J&J's exclusive contracts should be dismissed because Pfizer failed to plead adequate facts establishing that it attempted to compete.  J&J supports this argument by claiming Pfizer's allegations regarding the price of Inflectra and Remicade lack sufficient accuracy to make plausible Pfizer's efforts to compete.

J&J mainly takes issue with Pfizer's reliance on Average Sales Price ("ASP") and Wholesale Acquisition Cost ("WAC").  According to J&J, Pfizer cannot rely on ASP and WAC to support its efforts to

compete with J&J by offering lower prices because both metrics lack sufficient specificity.  J&J Corrected Mem. at 17.

As noted above, WAC is essentially a metric reflecting list price, whereas ASP is based on an annual average that does account for rebates and discounts off list price.  J&J argues that because WAC does not reflect the net price after discounts and rebates, it provides no indication about the price competition between Remicade and Inflectra.  The problem with ASP, according to J&J, is that because Remicade's current ASP reflects a yearly net average, and because Inflectra has been on the market for less than a year at the time Pfizer filed its Complaint, Remicade's ASP reflects pricing data from months where Inflectra was not yet on the market.  J&J Corrected Mem. at 3-4, 16-18.

At this stage, we find that Pfizer's allegations containing ASP data do support the plausibility of its claims.  According to Pfizer, it has priced Inflectra lower than J&J's Remicade even accounting for incentives such as bundled discounts and rebates. Pfizer also alleges that Remicade's ASP continues to increase despite Inflectra's entrance to the market at a 24 percent lower per unit cost.  Supp. Auth. at 2.  These allegations lend plausibility to Pfizer's theory that J&J is engaging in anticompetitive behavior, which is foreclosing biosimilars from competing.

We agree with J&J that the WAC provides minimal support for the proposition that Inflectra costs less on a unit-for-unit basis than

Remicade.  Nevertheless, Pfizer's allegations regarding Remicade's increasing WAC does support Pfizer's theory that J&J's bundled rebate force purchasers into excluding Remicade's biosimilars from the market.  Increasing Remicade's WAC in turn increases the penalties for not excluding Inflectra and other biosimilars in the form of lost incentives.  Accepting as true Pfizer's allegations that existing Remicade patients will not switch to a biosimilar despite price competition, the increasing penalties that payors may face for exiting patients may effectively force payors into accepting J&J's exclusionary terms for all patients.

J&J's arguments against Pfizer's support for its pricing allegations are misplaced--or rather, mistimed.  Discovery will reveal whether Pfizer has offered more competitive pricing for Inflectra, as alleged in its Complaint.  If Pfizer's claims about pricing prove true, then the pricing data may indicate that J&J's conduct has prevented Pfizer from competing in violation of the antitrust laws.  Ultimately, the legality of J&J's conduct will depend on whether it foreclosed a substantial share of the market such that competition has been harmed.  ZF Meritor, 696 F.3d at 283 (citing Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 326–28 (1961)).

## V.  CONCLUSION

For the foregoing reasons, J&J's Motion to Dismiss is denied. An appropriate Order will follow.